Charles E. Harding Company, Complainant, v. Charles E. Harding et al., Defendants.
Charles E. Harding, Defendant in Error, v. Charles E. Harding Company et al., Plaintiffs in Error.

Gen. No. 35,023.

122

Opinion filed December 29, 1931. Rehearing denied January 11, 1932.

GLENNON, CARY, WALKER & MURRAY, for certain plaintiffs in error; SIDNEY C. MURRAY, MARVIN A. JERSILD and HAROLD E. CHRISTENSEN, of counsel.

JUSTUS CHANCELLOR and JUSTUS CHANCELLOR, JR., for defendant in error; JUSTUS CHANCELLOR, of counsel.

MR. JUSTICE KERNER delivered the opinion of the court.

This writ of error challenges a decree obtained by Charles E. Harding upon his cross-bill. The com-

plainant Charles E. Harding Company, a corporation, by its amended creditors' bill, sought to reach certain assets of Charles E. Harding to satisfy a judgment obtained by it and to recover upon accounting from Harding a further sum of $17,947.38. Harding filed a cross-bill against John W. Sener, Erwin J. Feldes, James B. Nelson, Walfred Davis, Stockmen's Trust & Savings Bank, and others, who were not served with process and did not become parties to the proceedings. Nelson's death was suggested prior to the entry of the decree but no one was substituted for him. No rule to answer the cross-bill was entered as to Stockmen's Trust & Savings Bank and no answer was filed by it. By his cross-bill he sought to have set aside certain agreements dated April 4, 1922, between him and Sener, Feldes, Nelson and Davis. The cause was referred to a master to take the testimony and report his conclusions of law and fact. The master filed his report in which he found that plaintiffs in error were not guilty of duress, fraud or overreaching of defendant in error and recommended that the cross-bill be dismissed for want of equity and that a judgment be entered against Harding upon the accounting for $17,947.38. Objections to the report were ordered to stand as exceptions. There was a hearing on the exceptions, which were sustained, and on June 26, 1930, the court entered the decree which this writ of error seeks to have reversed.

The essential averments of the cross-bill are that for many years prior to March 13, 1922, Harding had been engaged in the live stock commission business in Chicago and throughout the territory adjacent thereto; that he employed Feldes, Sener, Nelson and Davis and placed them in positions of trust and confidence in connection with handling and management of the said business; that Feldes had gained his confidence to such an extent that he was intrusted by him with many very

important matters pertaining to said business; that Feldes formulated and conceived a plan to secure the said business and properties for himself and others who thereafter confederated with him and assisted him in obtaining from and depriving him of same. That said illegal plan was to compel him by means of misrepresentations, threats, offers of aid, intimidations and promises to enter into a certain agreement whereby he would be compelled to turn over and convey all of his assets, name, good will, the customers and business of Charles E. Harding Company, as well as all the properties of himself and wife, to and for the benefit of a corporation to be thereafter formed, the control of which was to be in the hands of plaintiffs in error, thereby securing to themselves the benefits, profits, good name, good will and the assets of the business which he had spent his life in securing and building up and which were of the value of not less than $275,000 without paying him therefor or giving him controlling interest in said corporation; that to carry out said illegal purpose and to accomplish said scheme he was caused to attend various conferences at which the plaintiffs in error were present when it was represented by them to him that he was in a terrible situation; that his business was about to fail; that the bank was then ready to force him out of business; that the government was inspecting the commission business at the Chicago Union Stock Yards; that a failure of his business at this time, under the eyes of the government, would be disastrous to the whole industry; that by reason of the aforesaid situation he had placed himself in a perilous position out of which he was liable to be sent to the penitentiary, all of which terrorized him and placed him in such a mental condition that he was unable to think clearly and decipher said illegal scheme; that when this advantage had been gained plaintiffs in error then presented said scheme

as the only method by which he could escape from said predicament and save his good name, property and business, and they further represented to him if he would but accept their plan they would see to it that everything would be all right for him; that his business would be secure and he would be protected in the ownership thereof; that they had funds of their own they would put into the business of a sufficient amount to pay all of its indebtedness; that the plan and statements coming as they did from his supposed friends, former employees and the president of the bank with which he had been doing business seemed to offer to his confused mind a bona fide and honest method of meeting the situation and not then realizing that he was the victim of a trap set by his employees and those whom he had trusted, to destroy him and deprive him of his good name, properties, business and reputation, he acquiesced in their request and agreed to sign the said documents and incorporate the said business; that after he had been maneuvered into this position and his consent to incorporate obtained, J. A. Gold, president of the Stockmen's Trust & Savings Bank, made seeming objections on the part of the bank not to said plan as a whole but only to that part which would give to defendant in error a sufficient amount of the capital stock in said corporation to insure to him the control and management thereof and so advised defendant in error which put him in a way of thinking he would have no trouble at any time in buying one of their interests which would give him control of the corporation. That plaintiffs in error then and as the next step in said plan and for the sole purpose of inducing him to enter said trap urged him to accept the said bank's condition and stated that they were still friends and would continue to be; that they could not run the business without him; that he individually was the life of the business without whom it could not prosper;

that it was his business; that he could handle it just as he had always done; that it would have his name; that Feldes made him believe that he (Feldes) was his friend, and that he would vote his stock with him in a manner to protect him in the ownership and management of his business; that he was then terrorized, broken in spirit and confused in mind by these promises and threats and not then having the opportunity to think clearly due to the great amount of pressure brought to bear upon him as aforesaid, and to the additional pressure that was brought to bear upon him by one Stafford, president of the Live Stock Exchange, unless he should acquiesce in said plan he (Stafford) would go before the Live Stock Commission and take the necessary steps to have him expelled therefrom, he agreed to sign the papers, incorporate his business and take all other necessary steps under the direction of plaintiffs in error to accomplish and secure the supposed relief offered him; that thereafter he signed said agreement which is in effect that plaintiffs in error would cause a corporation to be formed with a capital stock of $25,000, bearing the name of Charles E. Harding Company, and would cause to be delivered to defendant in error, free of charge 100 shares of the capital stock of the corporation fully paid and nonassessable; that they were to hold among them, according to their respective interests, the balance of the stock; that none of said stock was to be disposed of by any of the said stockholders until the same was first offered to other members of said corporation; that the said corporation was to take over his business, together with its assets, and was to assume and pay all of his indebtedness and that of the business; that he was to be employed by said corporation for a period of two years at a salary of $6,500 a year; that he was to transfer all of his properties and those of his wife to a trustee to secure the said corporation and those

who advanced money in payment of said indebtedness; that he had prepared a trust agreement listing all of his properties and those of his said wife and thereafter signed the same and turned over all of his personal assets, real estate and those of his wife to said trustee; that immediately after the signing of said contract as another step in said illegal plan to deprive him of his properties the said A. J. Gold, notwithstanding the fact that he had stated that the said Stockmen's Trust & Savings Bank would refuse to loan him any money upon his assets and business, nevertheless caused said bank to loan money to plaintiffs in error upon the security furnished by the assets of defendant in error placed in the hands of said trustee as aforesaid, and caused the same to be placed in trust in said bank in the name of Erwin J. Feldes as the trustee thereof; that at the time this money was advanced defendant in error had been informed and believed the fact to be true that plaintiffs in error were men irresponsible financially, as well as otherwise, and did not have between them an amount of money in the aggregate of $13,950 and did not have securities upon which to borrow the same and they could not have obtained the loan from said bank without using the assets and business of defendant in error; that immediately upon the incorporation of the business the said bank did accept the note of said corporation in the sum of $15,000; that the said note accepted as aforesaid was given by said corporation to take up the notes of plaintiffs in error which had been given at the time of the creation of said trust fund; that the interest on said note was charged on the books of said corporation to the account of defendant in error; that his properties and income therefrom have been used in payment of said loan, and that said loan though ostensibly made upon the credit of plaintiffs in error, in reality was made upon the credit of the assets and the business of

defendant in error and that the money from said loan was used by plaintiffs in error in payment of the capital stock which they received in said company and which gave them the controlling interest therein which money equitably belonged to him and should be used for his benefit and that the said stock so purchased and held by plaintiffs in error is in reality and should be declared by the court as held in trust for him and he should be declared to be the actual owner thereof; that immediately after said corporation had been formed plaintiffs in error immediately took the control of said business away from him and commenced a systematic campaign of discharging against his protest, former employees of his, personally friendly to him and his interests and that said discharges were without cause and uncalled for; that they adopted a policy of exclusion toward him, held secret meetings during the latter part of 1923 and during 1924 and determined on the policies of the company at a time when he was not present, notwithstanding the fact that he was a member of the board of directors; that at stockholders' meetings plaintiffs in error, acting in accordance with their illegal scheme and under a further illegal agreement between them and contrary to their representations, pooled their stock and voted in such a manner as to defeat and render his stock of no value and that they have, from the very beginning, banded together against him in the management of the business and in the voting of the stock and have acted contrary to his advice and wishes notwithstanding the fact that he is the largest individual owner of stock in said corporation and that under their management the said business has fallen off from a profit of $10,000 the first year to a loss during this year of $7,000.

That subsequent to the time of the incorporation he learned that in the handling and management of said business plaintiffs in error had engaged in the illegal

practice of giving rebates in matters of corn, weights and money to some shippers and of overcharging other shippers in matters of corn and weights for which illegal acts, notwithstanding the fact that he had nothing to do therewith, he was nevertheless responsible under the rules of the Live Stock Exchange, being a stockholder and one of the directors of said corporation; that desiring to protect himself, his customers, the business and his good name, he went to the head of the Live Stock Exchange and reported these unlawful acts on the part of plaintiffs in error; that immediately thereafter plaintiffs in error, without cause and in direct violation of the said contract of employment, discharged him from the employ of said corporation; that plaintiffs in error have caused proceedings to be instituted on July 22, 1924, in the circuit court of Cook county, No. B-111627 (the creditors' bill in the instant case) for the purpose of securing to themselves the stock in said corporation now belonging to him; that the judgment upon which the said bill is founded was rendered for costs in said superior court injunction proceeding which superior court proceeding was based upon rights claimed under said illegal contract and at the trial in said superior court the charges made therein were not before said court nor adjudicated by it nor was the legality of said contract questioned. The prayer of the cross-bill was that the court declare a trust in favor of defendant in error, order an accounting and that the contracts and agreements of April 4, 1922, be set aside and canceled.

The plaintiffs in error filed an answer denying that they were guilty of any violation of their duties or any violation of trust and confidence; that they were guilty of any duress, constructive fraud or overreaching of the defendant in error or of any unfairness to him or were actuated by any motives other than those of desiring to save the business and to carry it on with suc-

cess; they denied that they ever planned or considered depriving defendant in error of said business or of his property and alleged that the plan proposed, discussed and finally adopted, was fair and honest and a bona fide method of meeting the situation and denied there was any trap set or that Harding was a victim of any trap and they averred that all the matters and things concerning the making of the Charles E. Harding Company and concerning the turning over of the said Harding business to the said corporation and concerning the deeding of the assets of Harding other than the said business to Joseph A. Graber, as trustee, and of carrying on the business of the corporation after it was authorized to do business were all set out and considered in full by the superior court of Cook county in certain proceedings therein entitled *Charles E. Harding Company v. Charles E. Harding et al.,* and after a full hearing of the evidence and the arguments of counsel the superior court on April 28, 1924, duly entered a decree wherein all the questions concerning the said new corporation and concerning the rights and interests of the defendant in error and of the said corporation and its stockholders were duly and finally settled and decreed, and they asked the same benefit of setting up the said former adjudication in their answer as if they had duly set up the same by special plea.

By the decree in the instant case the chancellor found *inter alia* that the agreements dated April 4, 1922, between the plaintiffs in error and defendant in error were obtained by the plaintiffs in error by taking advantage of the confidence reposed in them by defendant in error while they were in his employ in positions of confidence and trust, and that they were obtained by duress, constructive fraud and the overreaching of defendant in error, and should be returned and restored to Harding, including the right to use his name

and the name of Charles E. Harding & Company; that the incorporation and organization of the complainant were in violation of the rights of defendant in error and that the capital stock obtained by the plaintiffs in error in said corporation was obtained by them in violation of the trust and confidence reposed in them by the defendant in error; that the plaintiffs in error should be found and held to be holding said capital stock in trust for the defendant in error; that an accounting should be had between the defendant in error and plaintiffs in error and Joseph A. Graber, trustee, of all property turned over by the defendant in error to and in accordance with the agreement of April 4, 1922; that plaintiffs in error are trustees of the business of Charles E. Harding and Charles E. Harding Company, acquired by them from defendant in error pursuant to and by means of the agreement of April 4, 1922, and it was ordered that the amended bill filed by complainant Charles E. Harding Company be dismissed for want of equity; that the agreement of April 4, 1922, be set aside, annulled and held for naught; that an accounting be had between the plaintiffs in error and the defendant in error of all property turned over by the defendant in error pursuant to the agreement of April 4, 1922; that the capital stock in the Charles E. Harding Company now possessed by any of the plaintiffs in error belonged by right to the defendant in error subject only to the accounting to be had between the plaintiffs in error and the defendant in error, and the cause was referred to a master in chancery to take the account.

There was no contest as to the creditors' bill and no exceptions taken by the defendant in error to the master's finding with respect to it, except in so far as the issues raised by the cross-bill constitute a defense.

The material facts as shown by the evidence are that in the spring of 1922, defendant in error, then 60 years

of age, was and had been for over 35 years in the live stock business, most of the time in the Union Stock Yards of Chicago. In 1920 he employed Erwin J. Feldes as a stenographer and advertising man and placed him in charge of correspondence. Defendant in error had confidence in Feldes and trusted him in every way and finally placed him in charge of the business. Feldes also looked after the financial affairs of the business and accepted and authorized payment of drafts but was not a bookkeeper and made no entries in the books. About the time Feldes entered the employ of defendant in error, James B. Nelson, who was Feldes' friend, was also employed by defendant in error. He was given charge of shipments. Sener was Harding's assistant in the yards and Davis was a butcher stock salesman. Harding had an account with the Drovers Bank, but most of his banking was done through the Stockmen's Trust & Savings Bank, although he never transacted business with the bank, Feldes always doing it for him. Defendant in error had one Mansfield and one Pfaelzer as customers. In 1921 both of these men failed, owing him $12,433.31 for drafts drawn and paid, where no stock had been shipped. Because of these losses and money withdrawn by defendant in error for his personal account he became financially embarrassed and was short of cash. Under the rules of the Live Stock Exchange the buyers were not required to pay for their purchases until 11 o'clock of the day following the sale. His daily sales amounted from $1,000 to upwards of $78,000. The proceeds of the sale were sent to the shippers the same day the sales were made either by depositing the cash in the shipper's bank in Chicago or by checks to the shipper to his home town as he might direct; unless he collected for all sales he had to use his own resources to carry the load which ranged from $500 to over $50,000 a day. Harding testified he

had his bookkeeper prepare monthly statements of his business. The statement prepared on March 31, 1922, showed an overdraft at the bank of $42,274.36. He further testified that he examined the statement and determined he needed more money in his business. That about a week before April 4, 1922, he informed Feldes he had to get more money in the business and requested him to get it and if he did he would pay him for it. That evening Feldes and Nelson met at Feldes home where Feldes informed Nelson that defendant in error had $30,000 in checks outstanding and only $5,000 in the bank with which to pay them. The following day Nelson and Feldes went to Bruce Stafford, president of the Live Stock Exchange, an association of commission men, which prescribes rules and regulations for the conduct of its business and laid the matter before him and asked what they ought to do, and Stafford said that he would take the matter up with the board of directors and let them act on it; thereupon Nelson said, "if you do that, Harding is liable to fail for $40,000 or $50,000 and it will ruin all of us, and we might as well quit business." Stafford then inquired if they could raise the money and Nelson said they could if given time. In this conversation Stafford also said that he was sorry that he had been informed of these facts, because he was a director of the bank. Nelson said, "I came to you as a friend and gave you these facts in confidence and am going to ask you not to say a word until 12 o'clock Saturday, to see if we can raise the money and tide this thing over." At 12 o'clock Saturday Stafford requested defendant in error to accompany Feldes, Nelson and himself to the bank. Feldes and Nelson had previously informed defendant in error that they had made various unsuccessful attempts to raise money; that the president of the Live Stock Exchange was prepared to call a meeting of the board and have him expelled and that

the bank was going to throw out his checks; that he was already overdrawn at the bank and had no money with which to meet his checks. Stafford, Feldes and Nelson and the defendant in error drove to the bank, where they met Sener. Here he was informed that he had one chance to save his good name and business and unless he consented to the proposition about to be submitted by them his checks would be thrown out on Monday morning and his name and business ruined.

There were three meetings—April 1, 2 and 4, 1922. The first was held at the bank on the afternoon and evening of April 1. Harding, Stafford, Gold, Feldes, Nelson and Sener were present, and it lasted until 8:30 o'clock when Stafford left saying the matter would have to be fixed up in some manner or he would report Harding to the Live Stock Exchange on Monday. All of the others remained until about midnight. Gold at this meeting told Harding that if the money was not in the bank Monday morning Harding's checks would not be paid. Sunday, April 2, Harding met again with Gold, Feldes, Sener and Davis, and continued the discussion. The proposition proposed was that a corporation be formed to have his name for which he was to have 40 per cent of the stock and the plaintiffs in error the remaining 60 per cent, that he turn over his name, business, farms, home, oil stock and his wife's inheritance and all of his private holdings, to a trustee. When he objected he was again informed that it was absolutely necessary that that be done in order to satisfy the exchange and the bank. At both these meetings Harding insisted that he have 51 per cent of the stock of the new concern; Gold, however, stated that Harding must give up his control of the business and told Harding if the then outstanding checks were not paid he might lay himself liable to criminal prosecution and that he would certainly be suspended or expelled by the exchange. The final

meeting was held at the bank on Tuesday, April 4, 1922, and the agreements involved in the instant case were signed. The bank's statement of the Stockmen's Trust and Savings Bank account showed that on March 30, 1922, defendant in error's cash balance was $24,259.43; the following day at the close of business his cash balance was $28,405.55; on April 1, it was $11,913; on April 3, it was $13,017.62 and on April 4, the date of the signing of the agreement it was $18,936.75. The business ran on for the month of April without any change or difficulty, just as it had been doing, without any outside support and all checks paid by the business. Harding completed the deal allowing the corporation in his name to be formed, transferred his business and assets by bill of sale, and the private holdings of himself and wife to the trustee. In the agreement of April 4, 1922, defendant in error acknowledges his liabilities at the close of business on March 31, 1922, amounted to $28,000, and the agreement provides that plaintiffs in error shall form a corporation with a capital stock of $25,000 to be called Charles E. Harding Company for conducting a live stock business, and cause it to issue to Harding 100 shares of its $100 par stock and to become security for the $28,000 net liabilities and that Harding transfer to this corporation the assets of his commission business and convey to Joseph A. Graber, as trustee, his real estate and oil stock, Graber to hold the title and collect the rents from the property and apply the same to discharge the net liabilities, when and as requested by the corporation, and that he shall have power to sell, lease or incumber any or all of the trust property and apply the rents, profits and income of any such sale, lease or disposition of incumbrance in discharge of the net liabilities of the business; and that Harding enter into an agreement with the corporation to work for it as a cattle salesman for two years for $6,500 a year and

give all his time and efforts to the corporation and not directly or indirectly conduct, aid or assist in any other live stock commission during the period.

As a result of the agreement of April 4, 1922, Harding on the advice of his attorney, executed a bill of sale, a trust agreement and deeds conveying his property to Graber as trustee. A corporation was organized and the books of the old company closed April 30, 1922. Feldes borrowed $2,500 from the Stony Island Trust & Savings Bank, where he did business, and $1,000 from Gold on a note signed by himself and wife. Nelson borrowed money on three insurance policies and from the Stockmen's Bank, where he did business, and turned over this money and a $700 note in payment of his shares, making a total of $3,750 for 37½ shares. Davis and Sener made their payments upon the stock issued to them and it was all deposited in the Stockmen's Bank to the credit of Feldes as trustee. On May 1, 1922, Feldes turned these funds amounting to $13,950 over to the new corporation. Gold had agreed to carry the business along if the contract was signed and the men showed their good faith by depositing their individual shares in his bank in Feldes' trustee account. The new corporation began to do business May 1, 1922. The checks of the old company outstanding on May 1, 1922, and the various items which the old firm owed were paid by the corporation. The auditors found these liabilities to be $37,323.56 on the last day of April, 1922. An account was opened on the corporation's books for Harding and an itemized statement of this account showing the debits and credits was received in evidence. These statements showed that Harding still owed the corporation $17,947.38, which amount the master found to be due it. Subsequently, on April 11, 1923, Harding filed a written complaint with the Live Stock Exchange against plaintiffs in error charging them with violation

of the exchange rules in regard to charges for feed and offered to appear and substantiate his charges. The exchange found nothing wrong in the transactions complained about and dismissed the charges. November 1, 1923, the complainant sent Harding a letter discharging him and stating the reasons therefor. Thereafter he and his son, under his own name, engaged in the live stock business, whereupon the complainant brought suit in the superior court, cause No. 395989, based upon the agreement of April 4, 1922, and the other agreements entered into pursuant thereto, to restrain him from using his name in the business and he was enjoined from doing business under the name of Harding. The costs in that proceeding amounted to $798 and a judgment for that amount was rendered against him. Thereafter on July 22, 1924, the complainant filed its creditors' bill in the instant case by which it sought to reach certain assets of the defendant in error to satisfy the judgment for costs in cause No. 395989, and to recover from Harding the further sum of $17,947.38. April 1, 1925, defendant in error filed his cross-bill.

The main ground urged by counsel for plaintiffs in error for a reversal is that the issues of duress, constructive fraud and overreaching of defendant in error are barred by the proceeding in superior court cause No. 395989, which will hereafter be referred to as the injunction suit.

From the record it appears that the defendant in error was discharged by the Charles E. Harding Company November 1, 1923; that shortly thereafter he engaged under the name of Charles E. Harding & Son in the live stock business at the Union Stock Yards; that thereupon the injunction suit was brought against him and his son to restrain and enjoin them from the use of the name of ''Charles E. Harding.'' In the bill the execution of the agreement involved in the instant

case was alleged and that Harding had in the contract agreed he would not directly or indirectly conduct or assist in any other live stock business in Chicago for the two-year period for which he was engaged by the Charles E. Harding Company. Defendant in error by his answer in the injunction suit denied he had conveyed the exclusive use of the name of Charles E. Harding and that the complainants had the right to exclude him from using his own name. Upon this issue the superior court decreed that Harding be enjoined and restrained from using the name of Charles E. Harding in the live stock business. Plaintiffs in error were not parties to the injunction suit, but practically the same evidence as that upon which relief is here sought was presented. The superior court in the injunction suit found that Charles E. Harding had entered into an agreement in writing with the Charles E. Harding Company whereby he contracted to work for it as a cattle salesman for a period of two years from the date of the incorporation of that company for a salary of $6,500 a year, and ordered and decreed that Charles E. Harding be enjoined and restrained from using in the live stock business the firm name of Charles E. Harding & Son.

A large number of cases have been cited by the plaintiffs in error on the authority of which they claim it was obligatory on the defendant in error, if he claimed the agreement of April 4, 1922, was obtained by duress, constructive fraud and overreaching, that he make such defense in the injunction suit, and having failed to do so he cannot maintain a separate suit for relief on those grounds and that all matters which were or might have been determined in the injunction suit are *res judicata*. We agree with counsel for plaintiffs in error that the doctrine of *res judicata* is not a mere matter of practice or procedure inherited from a more technical time than ours, and that it is a rule

of elementary and substantial justice of public policy and of private peace which should be cordially regarded and enforced by the courts to the end that rights once established by the final judgment of a court of competent jurisdiction shall be recognized by those who are bound by it in every way wherever the judgment is entitled to respect, and that a judgment of a competent court of jurisdiction upon a question directly involved in one suit is conclusive as to that question in another suit between the same parties. But the defendant in error replies that it must appear either upon the face of the record or be shown by extrinsic evidence that the precise question was raised and determined in the former suit; in other words, that where the former adjudication is relied upon as an absolute bar there must be as between the two actions, identity of parties, of subject matter and cause of action, and in arguing for an affirmance of the decree, counsel says, the questions of fraud now sought to be adjudicated were not put in issue by the pleadings nor decided by the decree and that Feldes, Nelson, Davis and Sener were not parties to the injunction suit. They were, however, stockholders of the corporation and had in fact a vital interest in the outcome of the litigation and it is immaterial that no issue was raised by defendant in error as to the validity of the agreement.

In the case of *Hanna v. Read,* 102 Ill. 596, 602, it is said that it is not universally true that before an adjudication in a former case can be made available as an estoppel, it must appear that the thing sought to be recovered and the cause of action in both suits be the same; that where some specific fact or question has been adjudicated and determined in a former suit, and the same fact or question is again put in issue in a subsequent suit between the same parties, its determination in the former suit, if properly presented and

relied on, will be held conclusive upon the parties in the latter suit, without regard to whether the cause of action is the same in both suits or not; that this species of estoppel is known to the law as an estoppel by verdict, and is equally available to a plaintiff in support of his action, when the circumstances warrant it, as when offered by a defendant as a matter of defense; and that, whether the adjudication relied on as an estoppel goes to a single question, or all the questions involved in a cause, the fundamental principle upon which it is allowed in either case is that justice and public policy alike demand that a matter whether consisting of one or many questions, which have been solemnly adjudicated by a court of competent jurisdiction, shall be deemed finally and conclusively settled in any subsequent litigation between the same parties, where the same question or questions arise, except where the litigation is a direct proceeding for the purpose of reversing or setting aside such adjudication; and on page 605 it is further said: ''It is sufficient for the purposes of the rule relating to a former adjudication, when relied on as an estoppel, that the parties be substantially the same. . . .'' In *Godschalck v. Weber,* 247 Ill. 269, 274, it is said: ''The doctrine of *res judicata* extends not only to the questions which were actually decided in the former case, but to the whole controversy,—to all matters properly involved which might have been raised and determined, and to all grounds of recovery or defense which the parties might have presented, whether they did so or not.'' (See also *Stickney v. Goudy,* 132 Ill. 213, 231; *Harmon v. Auditor,* 123 Ill. 122, 130; *South Park Com'rs v. Montgomery Ward & Co.,* 248 Ill. 299, 312; *Bacon v. Reichelt,* 272 Ill. 90; *Marshall v. John Grosse Clothing Co.,* 184 Ill. 421; *Singer v. Hutchinson,* 183 Ill. 606; *Weberpals v. Jenny,* 300 Ill. 145; *Phelps v. City of Chicago,* 331 Ill. 80; *Bayer v. Bloch Real Estate Im-*

*provement Co.*, 246 Ill. App. 416; *Edmanson v. Best*, 57 Fed. 531.) In *Harvin v. Blackman*, 121 La. 431, 435, the court said:

"Fraud, tainting the plaintiff's cause of action, is a defense which the defendant is bound to set up when he has opportunity to do so; and, if he neglects to avail himself of this means of defeating the claim made against him, he will be precluded by the judgment from afterwards alleging such fraud."

Applying the principles thus announced to the facts in the instant case, we are compelled to the conclusion that the legality of the agreement of April 4, 1922, was litigated and determined in the injunction suit, or should have been, and therefore the issues of duress, constructive fraud and overreaching of defendant in error in the instant case are barred by the injunction suit and are *res judicata* of the controversy in the present suit.

Plaintiffs in error have also assigned as error and argued that the agreement was not obtained by duress, constructive fraud or overreaching and that Harding's conduct subsequent to the execution of the agreement of April 4, 1922, is a complete bar to the relief sought, but in the view we have taken it will not be necessary to discuss those assignments.

The decree of the superior court will be reversed and the cause remanded with directions to dismiss the cross-bill for want of equity and to enter a decree in accordance with the prayer of the amended bill of complaint.

*Reversed and remanded with directions.*

GRIDLEY, P. J., and SCANLAN, J., concur.